IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CHRIS JOHNSON,

        Plaintiff,

vs.

Case No. 09-2664-JTM

DENNIS K. ROBERTS,
THE BOARD OF COUNTY
   COMMISSIONERS OF MIAMI
   COUNTY, KANSAS, AND
FRANK W. KELLY, SHERIFF OF MIAMI
   COUNTY,

        Defendants.

MEMORANDUM AND ORDER

This is an action by former Miami County, Kansas jail inmate Chris Johnson, alleging that he was subjected to excessive force when he was tasered while in the jail. The matter is before the court on the defendant's Motion for Summary Judgment.

*Findings of Fact*

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary

judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

On December 3, 2009, Chris Johnson ("Johnson") was an inmate and Dennis Roberts ("Roberts") and Wesley McClain ("McClain") were deputy jailers at Miami County Jail. When Roberts came to work that day, he noticed Johnson's towel hanging down from the bunk in his cell, secured by his property box. Jail rules allow a towel to be kept outside the property box for the purpose of drying, but Johnson had hung his towel with the short side hanging down over the side of the top bunk.

Prior to that date, Johnson had been warned that he could not hang his towel from his bunk, as it would obstruct the view of his cell from security cameras. Roberts told Johnson on December 3 that if his towel obstructed the view of the bunk, he would be written up for a disciplinary

violation. Roberts reviewed the tapes for the security cameras and found the towel obstructed the view of the bottom bunk in Johnson's cell.

It is a violation of the prison rules to obstruct the surveillance cameras on any part of an inmates cell.[1]  According to Miami County Sheriff Frank W. Kelly, this policy is necessary to prevent unnecessary damage to cells, reduce hiding places for contraband and weapons, to ensure inmates are not harming themselves, and to simplify cell searches and property inventories.

Roberts wrote a disciplinary report, and then went with McClain to Johnson's cell to give him the citation and confiscate his property box.  After Roberts handed the report to Johnson and asked him to sign it, Johnson wadded up the report, threw it in the toilet, and flushed.  Roberts ordered Johnson to hand over his towel and property box.  Johnson handed his towel to Roberts through the cell door and McClain opened the cell door.  Johnson threw the property box at Roberts and it struck Roberts on the foot.  It is a violation of jail rules to refuse to comply with orders from jail staff.

Roberts pulled his taser and ordered Johnson to pick up his property box, Johnson refused, Roberts repeated the demand, and Johnson refused a second time.  Roberts fired the taser at Johnson, who grabbed his mattress.  The taser prongs stuck to the mattress.  Roberts ordered Johnson to turn over the mattress to the deputies, but Johnson refused.  Roberts tried to pull the mattress away from Johnson and a struggle ensued.  Roberts tried to drive stun Johnson, but was unsuccessful because the taser did not fire.[2]  Johnson also continued to use the mattress to protect himself from the taser. Eventually, Roberts physically took the mattress from Johnson, and McClain moved it to the side of the cell.

---

[1]Johnson contends the policy in the inmate handbook, which states that "obstructing the view of the camera on any inmate cell" is a prohibited act, means that he is in compliance with the policy as long as at least one camera remains unobstructed.  However, the Court finds that the Sheriff reasonably interprets this policy to mean that if the view of any camera is obstructed, it is a violation of prison rules.

[2]"Drive stunning," also known as "dry stunning" is a technique in which a taser is put in direct contact with a target and activated.  This is an alternative to firing the prongs from a distance.

Having lost the mattress, Johnson picked up a blanket, which Roberts also ordered him to turn over. Johnson refused and another brief struggle ensued. Johnson used the blanket to shield himself while Roberts tried and failed to drive stun Johnson a second time because the taser did not fire.[3] Ultimately, Roberts was able to take the blanket and remove it and the mattress from the cell. The entire incident was over in a few minutes.[4]

Roberts had not come to Johnson's cell to take Johnson's mattress or blanket, and Johnson stresses that Roberts did not explain to him *why* he wanted the mattress and blanket. However, the Court finds the reason for requesting the mattress and blanket was obvious – Johnson was suing to aid in defiance of Roberts's orders.

Roberts and McClain left the cell, locked the door, and then McClain took the taser prongs out of the mattress. After Roberts left the cell, Johnson threatened to "get" Roberts and that he was going to file charges. Johnson also asked to speak to the Sheriff. A short time later, Roberts and McClain came back to the cell to clean some debris from Johnson's cell. Before bending down to clean the debris, Roberts waited until Johnson had moved what Roberts believed to be a safe distance away. Johnson waited at the back of the cell while Roberts finished cleaning the debris.

After the incident, Johnson paced in his cell. Meanwhile, Roberts filed a taser usage report stating that Johnson was "resisting," that Johnson's resistance consisted of "refusing to release property;" and that Johnson "refused to comply with officers [sic] commands." Between one and two hours later, McClain noticed a note on Johnson's cell indicating Johnson needed medical attention. McClain did not see an urgent need for medical care. Johnson later asked McClain for medical care again. Roberts brought Johnson a medical complaint form. In the time after the

---

[3]Johnson states in an affidavit that Roberts used the taser on him in excess of ten times. However, it is not clear from Johnson's statements that he was actually stunned from each "use" of the taser. The Court assumes for purposes of the present Motion for Summary Judgment that Johnson received multiple shocks during the brief encounter in the cell.

[4]A review of the video from the camera outside Johnson's cell indicates the entire incident, from the time Roberts appeared in the frame to the time the items were removed and the cell door closed, took place in about three minutes and four seconds.

incident, Johnson could stand and walk. Although Johnson claimed to be in pain, he appeared to Roberts and McClain to be unhurt.

Officers in the jail are to use the minimal level of force when it is necessary to ensure compliance with lawful orders and maintain order and security because it places the officer in less danger than a direct physical confrontation. Non-lethal force such as a taser is preferred over direct physical force because it allows the officer to stay in control and limits unforeseen injuries to inmates. According to Sheriff Kelly, after Johnson had refused the direct orders of Roberts, it was proper to attempt to ensure compliance by using the taser before forcing compliance through direct physical force. In Sheriff Kelly's opinion, the physical force used on Johnson was necessary to maintain order and security within the jail.

In his Response, Johnson stresses that Roberts was not assigned a taser and the taser is kept under lock and key. Jail policy states the taser may only be used with authorization from the jail supervisor. In their Reply, Roberts avers that jail officers have keys to the taser and are permitted to use it in the event they believe it necessary to protect any officer from any threats posed by inmates. Prior to going to Johnson's cell, Roberts took the taser from its lockbox and brought it to Johnson's cell in his belt, ready to use it against Johnson. The taser was brought along as a precaution because Johnson had previously made unspecified threats toward Roberts.[5]

Roberts had declined to participate in a voluntary tasing, but he was aware both that taser use may cause serious injury or death and that tasers are designed to reduce the likelihood of such serious injury or death. Roberts also knew that tasers are designed to incapacitate subjects.

The Sheriff's Department has a general policy regarding the use of force which covers both inmates and non-inmates. The policy states that "deputies should use force with the highest tactical degree of restraint."[6] The policy also states that justification for the use of force is determined by

---

[5]However, because this information first appears in the defendants' Reply, it does not form the basis for any of the Court's findings of fact as to the material issues in the case.

[6]The policy does not support Johnson's requested finding that physical force should only be used when verbal communication or other means cannot achieve the required action. It

5

the subject's resistence and whether the level of force "was necessary but not excessive when considering the type of resistence offered by the subject." Finally, the policy says that "good communication skills or a verbal direction can resolve many situations. Often the mere presence of a deputy and proper verbal direction will be sufficient to persuade most individuals to follow a deputy's direction."

The policy of less-lethal weapons states that "[u]se of the TASER X26 is permitted to protect the deputy or the public from what it reasonably believed to be a non-compliant and/or threatening subject." It also states that taser use is permitted "during training sessions or to support an outside agency requesting assistance; to assist the capture of any dangerous or wild animals that present the threat or potential threat to the deputy or the public safety."

In his Response to the Motion for Summary Judgment, Johnson presents several requested findings of fact[7] premised *solely* upon the video record of the incident. The Court has carefully reviewed the video recordings[8] and finds that in numerous instances the videotape does not support the requested finding. Accordingly, in these findings of fact, the Court omits any requested findings of fact based solely on speculation or on the video evidence where the video does not support the requested finding.

Noting that the defendants have included some additional evidentiary materials in their Reply, Johnson has also moved to either strike a portion of the defendant's Reply, or for leave to file a Surreply. Surreplies are disfavored, and in the present case wholly unnecessary, as the court premises its factual findings on the basis of the evidence submitted in the defendants' initial Memorandum and Johnson's subsequent Response.

---

simply requires the highest tactical degree of restraint, which does not foreclose the possibility physical force may be necessary.

[7] *See, e.g.*, Resp. at ¶¶ 7, 16, 20, 21, 22, 27, 32, 37, 46, 55, 64, 66, 67, 68, 69, 72, 73, 75, 80, 81, 82-85, 86, 102-105.

[8] There are video recordings of the incident from two viewpoints: first, the fixed camera outside the cell, and a second camera built in to the taser Roberts was using.

*Conclusions of Law*

Defendants have moved for summary judgment claiming that they entitled to qualified immunity. Qualified immunity is an "entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsythe*, 472 U.S. 511, 526 (1985). Government officials performing discretionary functions are typically eligible for qualified immunity unless two conditions are met: (1) the official violated a statutory or constitutional right and (2) the right was clearly established at the time the alleged violation occurred. *Lowry v. County of Riley*, 522 F.3d 1086 (10th Cir. 2008). Once defendants asserted a qualified immunity defense, the burden shifted to Johnson to show the relevant law was clearly established, and to come forward with sufficient facts to show Roberts violated the clearly established law. *Foote v. Spiegel*, 118 F.3d 1416 (10th Cir. 1997). Defendants argue that Johnson cannot establish that his constitutional rights were violated, and even if they were, the right against the use of the taser in this type of situation was not clearly established at the time of the incident.

The Eighth Amendment prohibits the unnecessary and wanton infliction of pain. *Hudson v. McMillan*, U.S. 1, 5 (1992). In order for Johnson to show a violation of his Eighth Amendment rights, he must show that Roberts used the taser not in a good-faith effort to maintain or restore discipline inside the jail, but rather to maliciously and sadistically cause harm to Johnson. *See Hudson*, 503 U.S. 1, 7. By hanging his towel in a way that obstructed the cameras, Johnson had broken a rule designed to advance prison order and security. Johnson had been warned previously about obstructing the cameras, yet was uncooperative when Roberts and McClain came to confiscate the towel and the property box. When asked to hand over the property box, Johnson either dropped or threw the box to the floor. This was reasonably interpreted as an act of defiance, especially after Johnson refused Roberts' order to pick up the box. Only after Johnson refused to pick up the property box did Roberts attempt to use the taser on Johnson. Throughout the incident, Roberts gave Johnson several orders to surrender items (the property box, the towel, the mattress, and the

7

blanket). When the taser failed to force compliance with Roberts's orders, Roberts resorted to physical force.

Johnson argues that force was not necessary to confiscate the property box because Roberts could have picked it up off the floor. However, this argument merely amounts to second-guessing the actions of a trained prison officer. The facts indicate Roberts acted out of a good faith effort to restore order and discipline in the jail. Roberts had just witnessed an act of defiance by Johnson (throwing the disciplinary report in the toilet). Thus, ordering Johnson to pick up the property box was a valid and reasonable order. Bending down to retrieve the property box from the floor could have put Roberts in a compromised position directly in front of a noncompliant inmate. In order to ensure the safety of everyone involved, Roberts reasonably ordered Johnson to pick up the box, which he, in turn, refused to do.

Johnson advances other arguments challenging the propriety of Roberts's actions. Johnson claims Roberts kicked the property box, and that doing so was unnecessary, Roberts did not explain why he wanted to confiscate the mattress, and attempting to incapacitate Johnson was incompatible with the goal of forcing him to hand over the property box. All of these arguments again constitute the second-guessing of Roberts's actions. The question is not whether there was a different way Roberts could have acted, but whether Roberts's actions violated the Eighth Amendment. Roberts's actions were in direct response to Johnson's initial refusal to comply with Roberts's orders. The situation escalated from there, both with more defiance on the part of Johnson and more force on the part of Roberts. Johnson cannot show that Roberts's actions were a malicious or sadistic attempt to cause harm. Rather, his use of the taser began only after Johnson refused to comply with Roberts's order and ended as soon as Roberts had restored order by confiscating all of the items Johnson was using to defy the jail officials. Thus, Roberts's use of force was reasonable under the circumstances and was not a violation of the Eighth Amendment.

Assuming for a moment that Johnson's constitutional rights were violated, he would also have to show that those rights were clearly established at the time the violation occurred. In order

for a constitutional right to be considered clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing would violate that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This does not mean that the very act of using a taser in this situation has been previously held unlawful, but rather in light of existing precedent, the unlawfulness of the act was apparent. *Id.*

The use of a taser in this situation was not a clearly established violation of the Eighth Amendment at the time this incident occurred. Johnson devotes a considerable portion of his response to distinguishing the cases defendants presented to support their motion. Johnson distinguishes *Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir. 1988) and *Soto v. Dickey*, 744 F.2d 1260 (7th Cir. 1984) on the basis that they dealt with maximum security prisons rather than a jail, *Caldwell v. Woodford County*, 968 F.2d 595 (6th Cir. 1992) because it was regarding a prisoner being held in solitary confinement, and *Poindexter v. Woodson*, 510 F.2d 464 (10th Cir. 1975) because it analyzed force used to control a prison riot. He also advances his theory that none of the cases support the use of force as punishment, claiming that was Roberts's motivation here. First, there is no evidence Roberts sought solely to punish Johnson, but rather the evidence indicates Roberts sought to restore order after Johnson had shown defiance toward the officers and refused to comply with their orders. Second, the attacks Johnson makes on the defendants' supporting cases are largely irrelevant to his goal of defeating defendants' summary judgment motion.

Although Johnson attempts to distinguish defendants' cited authorities, he does not present a single case clearly establishing that the use of a taser to ensure an inmate's compliance with orders violates the Eighth Amendment. Cases holding that qualified immunity does not protect taser use in a correctional environment have involved markedly different facts from those present here. Thus, in *Lewis v. Downey*, 581 F.3d 467 (7th Cir. 2009), the court held that qualified immunity would not apply where the defendants used a taser without warning on a docile, nonthreatening inmate lying prone in his bunk. In reaching this conclusion, the court stressed that the taser and other non-lethal devices can play a legitimate role in enforcing orders in correctional facilities:

9

> Jails are dangerous places, and it is without rational dispute that security officials are justified in maintaining decorum and discipline among inmates to minimize risks to themselves and other prisoners. *See Bell* v. Wolfish, 441 U.S. [520,] 546 [(1979)] ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."); *Soto*, 744 F.2d at 1269 (according prison officials wide-ranging deference to adopt and execute policies "needed to preserve internal order and discipline"). We have previously discussed how important it is that prisoners follow orders:
>
>> Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them.... Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.
>
> *Soto*, 744 F.2d at 1267; *see also Colon v. Schneider*, 899 F.2d 660, 668-69 (7th Cir.1990).

581 F.3d at 476-77.

Without some clear precedent supporting his claim that the constitutional law on this issue is clearly established, summary judgment in favor of the defendants is appropriate. Johnson must do more than attempt to weaken defendants' case; he must come forward with controlling precedent of his own that clearly demonstrates Roberts should have known his actions violated the law. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). Johnson simply has not carried his burden.

IT IS ACCORDINGLY ORDERED this 29th day of June, 2010, that the defendants' Motion for Summary Judgment (Dkt. 35) is hereby granted. Plaintiff's Motion to Strike or for Leave (Dkt. 48) is hereby denied.

s/ J. Thomas Marten            J.
THOMAS MARTEN, JUDGE